IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELECTRO-MOTIVE DIESEL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 5837 |
| | ) | |
| WI-TRONIX, LLC, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Electro-Motive Diesel, Inc.'s ("EMD") motion for a preliminary injunction and on Defendants' motion for sanctions. For the reasons stated below, we deny the motion for a preliminary injunction and we deny the motion for sanctions.

## BACKGROUND

EMD alleges that General Motors-Electromotive Division ("GM-EMD") developed a computer system called the Functionally Integrated Railroad Electronics ("Fire") system. According to EMD, the Fire system is a network of one or more computers that are used in the operation of a locomotive and for interfacing with the

1

electrical components on the locomotive. EMD claims that all of the individual Defendants worked as engineers on the Fire system as employees of GM-EMD. EMD also claims that the individual Defendants worked with GM-EMD on obtaining a contract with the Federal Railroad Administration ("FRA") on a project called the Advanced Concept Train ("ACT") project. EMD alleges that Defendants Lawrence B. Jordan, Jr. ("Jordan") and Michael D. Heilmann ("Heilmann") developed the Defendant company Wi-Tronix, LLC ("WT") while they were employed by GM-EMD. EMD also claims that Jordan and Heilmann quit their employment with GM-EMD in order to work full-time for WT. Jordan and Heilmann also allegedly recruited Defendants Lisa Matta and Duane D. Hong to come work for WT.

EMD states that in 2005, it purchased essentially all of the assets of GM-EMD from General Motors Corporation. EMD also contends that after purchasing GM-EMD it pursued the contract for the ACT project, but that WT was ultimately awarded the contract instead of EMD. EMD claims that WT cannot satisfy its obligations under the ACT contract without using information regarding the Fire system that the individual Defendants acquired while working for GM-EMD.

Defendants argue that EMD declined to enter into a contract with the FRA for the ACT project and that EMD has reduced the scope of its previously proposed

work on the project. According to Defendants, the FRA solicited public bids to complete the tasks on the ACT project that EMD has refused to perform and WT was awarded the contract based on its bid. Defendants also contend that EMD has issued software called a Fire Developer's Kit ("FDK") to Science Applications International Corporation ("SAIC"), which is a participant in the ACT project. Defendants claim that they plan to use the FDK to complete their required tasks on the ACT project. EMD moved in this action for an entry of a preliminary injunction and this court held a preliminary injunction hearing ("Hearing") in this action on March 13, 2006. Defendants also now move for sanctions based on EMD's filing of the motion for a preliminary injunction.

**LEGAL STANDARD**

A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Illinois Dept. of Financial and Professional Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)(stating that "[a] preliminary injunction is an extraordinary and drastic remedy")(quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). In order to obtain a preliminary injunction, a plaintiff must show that: "(1) [the plaintiff] ha[s] a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) [the plaintiff] will suffer

irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *Goodman*, 430 F.3d at 437.

## DISCUSSION

I. Motion for Preliminary Injunction

     EMD requests that the court enter a preliminary injunction preserving the status quo during the pendency of this action.

     A. Likelihood of Success on the Merits Factor

EMD argues that it has a strong likelihood of success on the merits. To determine whether a plaintiff has a likelihood of success on the merits, the court must assess whether the plaintiff has "a greater than negligible chance of winning . . . ." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002)(stating that "[a] party with no chance of success on the merits cannot attain a preliminary injunction"). In addition, the court should use a "sliding scale" approach when considering potential harms to the parties, and the required showing by the plaintiff for the likelihood of success on the merits can be lessened if there is "a greater predominance of the balance of harms." *Id.* (stating that "[i]n performing

4

this balancing, the court bears in mind that the purpose of a preliminary injunction is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit'"). In the instant action, EMD argues that it will be harmed if the court does not enter a preliminary injunction because Defendants are planning to improperly use their knowledge of the Fire system to perform the obligations of WT on the ACT project.

1. EMD's Witnesses

In addition to certain documentary evidence presented with EMD's motion, EMD presented witnesses at the Hearing. However, the testimony of EMD's witnesses did not show that EMD had a likelihood of success on the merits in this action. Rather, the testimony of EMD's witnesses exhibited their lack of knowledge in regard to pertinent matters in this action. There was a number of relevant factual issues about which the EMD witnesses were questioned, and each witness in turn emphasized the limited scope of his knowledge, leaving many of the factual issues that were central to EMD's claims unanswered by EMD's witnesses and their testimony was not sufficient to meet the burden for a preliminary injunction. *See Goodman*, 430 F.3d at 437(stating that a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion").

a. Rissman Testimony

EMD called Thomas R. Rissman ("Rissman"), the Vice President and General Counsel of EMD, to testify at the Hearing. Rissman conceded at the Hearing that until the day before, he was unaware of the existence of evidence showing that EMD had issued a FDK to SAIC for the ACT project, and that he was "surprised it existed . . . ." (TR 21, 63). Rissman admitted that his sworn declaration concerning the rights of the ACT project participants, which he filed prior to the Hearing, was not accurate. (TR 24-25, 53). Thus, the evidence presented at the Hearing showed that Rissman was not aware of the rights that EMD had extended to the participants of the ACT project, despite the fact that those rights are central to EMD's claims in the instant action and its motion for a preliminary injunction. Rissman also admitted that he did not know the names of all the participants in the ACT project, despite the fact that the rights of those participants are a key issue in this matter. (TR 53). Rissman also admitted that he did not know if there has been a change in the policy in dealing with FDKs on the ACT project since the date that EMD purchased the assets of GM-EMD. (TR 57).

In addition, Rissman was asked certain questions regarding how someone could build a messaging bridge to the Fire computer and other technical issues, but

Rissman conceded that he was not a technical expert and that he only understood such matters "in laymen's terms." ( TR 22, 45, 46). Rissman was also asked questions concerning the original proposed scope of the tasks that EMD would perform on the ACT project and the current proposed scope of the tasks. (TR 32). Rissman stated that he was unfamiliar with the details of either the original or the current scope of the proposed tasks that EMD would perform on the ACT project. (TR 32). Rissman indicated that the original scope was negotiated before he came to work for EMD and indicated that he only knew what he heard in general terms from another EMD employee about the current scope of the proposed tasks. (TR 32). Rissman also admitted that he was not knowledgeable concerning the contents of the non-compete and non-disclosure agreements signed by Defendants for GM-EMD and that he could not verify or deny that Defendants were asked to sign new agreements when EMD purchased the assets of GM-EMD. (TR 38). Thus, although EMD chose to call Rissman as one of its three witnesses, Rissman's testimony left many pertinent issues unaddressed.

b. Wilbracht Testimony

EMD also called Gary Wilbracht ("Wilbracht") to testify at the Hearing. Wilbracht made it clear that the FRA envisioned that certain specific tasks would be

completed in the ACT project. Wilbracht acknowledged that during negotiations with the FRA, EMD had reduced the scope of the work that EMD proposed to complete for the ACT project. Wilbracht was unable to offer any rational explanation as to how the FRA would be able to complete the remainder of the ACT project if EMD insisted that it would not do so and that the FRA could not hire another contractor to do so. When Wilbracht was asked whether EMD was going to seek another contractor to do the work on the ACT project that EMD had declined to perform, Wilbracht stated that he did not know because he is "a finance guy." (TR 86). Wilbracht also admitted that he was not knowledgeable regarding the FRA's public request for proposals to perform the additional work on the ACT project. (TR 87). In addition, Wilbracht admitted that he was not knowledgeable concerning the licensing agreements that EMD entered into with the participants on the ACT project. (TR 88). When Wilbracht was asked questions concerning technical matters that were important to this case, he admitted his lack of knowledge and stated for the second time that he is only "a finance guy." (TR 91). Wilbracht also stated that his limited area of knowledge did not include how EMD interpreted the terms of its contracts or EMD's policies in dealing with FDKs. (TR 91-93). Thus, Wilbracht also left many pertinent issues unaddressed.

### c. Rudolph's Testimony

EMD also called Wayne Rudolph ("Rudolph"), an employee of EMD, to testify at the Hearing. Rudolph was asked if a FDK could enable a third party to build a messaging bridge to the Fire computer. At first, Rudolph merely indicated that he was not aware of such a FDK. Rudolph then indicated in a one-word denial that he did not think a FDK could be used to create such a messaging bridge, without an explanation for his conclusion. Rudolph stated that he merely relied upon his declaration submitted in this case. Rudolph indicated that, to his knowledge, the FDK could not be used to create the messaging bridge, but he displayed a lack of conviction during his testimony concerning whether it was at all possible. Thus, EMD's witnesses left more pertinent questions unanswered than answered, and did not show that EMD is likely to prevail on the merits in this case.

### 2. Completion of ACT Project in the Absence of EMD

The evidence at the Hearing showed that EMD had already performed a few of the tasks needed for the ACT project and that the FRA was required to find another party to complete the tasks contemplated under the ACT project. At the Hearing, Defendants pointed out that the ACT project contemplated the completion of certain listed tasks. When EMD's witnesses were asked how the FRA was

expected to complete the ACT project without constructing the necessary messaging bridge to the Fire system, EMD's witnesses had no logical explanation. The evidence shows that in order for FRA to complete the ACT project, it would need to interface with the Fire computer on the locomotives. The evidence also shows that EMD had prepared FDKs for parties involved in the ACT project, and that those FDKs were specifically intended to allow third parties to develop applications that interface with the Fire computer, without allowing the third parties access to confidential information. The evidence also shows that the participants in the ACT project were provided with the FDKs by EMD. Defendants' witness Norman Bridge ("Bridge") explained that if the FRA was not allowed to contract other parties to accomplish the tasks that EMD refuses to perform and construct the necessary messaging bridge, the project could never be completed. (TR 125-126). We agree with Defendants that since the ACT project contemplated the completion of a certain list of tasks that EMD first agreed to work on, but, then declined to enter into a contract to perform such tasks, it was reasonably understood by EMD and the FRA that the FRA would need to hire other contractors to complete the ACT project and that the FRA would need to be able to build the necessary messaging bridge to the Fire computer.

### 3. Completion of Remaining Tasks in the ACT project

Defendants presented evidence at the hearing showing that they could create the necessary messaging bridge for the ACT project with the FDK that was provided to SAIC. Defendants presented testimony by Bridge, who oversaw the development of the Fire system and was involved in GM-EMD's negotiations with the FRA regarding the ACT project. Defendants also presented testimony by Jordan, who worked with the Fire system at EMD. Both witnesses explained why they believe that a FDK could be used to create the necessary messaging bridge and why such a plan would not jeopardize the confidentiality of EMD's trade secrets. (TR 126-27, 151-52). Although EMD took a contrary position, it offered no evidence, other than the conclusory statement offered by Rudolph indicating that he did not think it possible to use the FDK to create the messaging bridge and the suppositions of EMD's other witnesses who conceded their lack of technical knowledge.

4. EMD's Control Over Sublicense and Installation of Messaging Bridge

Even if Defendants were to attempt to utilize SAIC's FDK to create the necessary messaging bridge, the evidence at the Hearing clearly showed that EMD could control whether Defendants could ultimately implement the bridge in the locomotive. EMD's witnesses testified that EMD would have to approve any sublicense between SAIC and Defendants. (TR 59-61, 88, 97-98). EMD's witnesses also indicated that in order to install the messaging bridge for the ACT

project, a secret password is required and that EMD would need to install the bridge. (TR 61-62). Thus, the evidence showed that even if Defendants attempted to use SAIC's FDK, EMD would have control over the usage because Defendants would have to sublicense the FDK in compliance with the licensing agreement signed by SAIC. Rissman stated that he thought that Jordan possessed the password, but gave no explanation for his conclusion. (TR 61). EMD ultimately controlled the installation of the messaging bridge and thus Defendants could not install any software without EMD's permission and knowledge. Defendants have conceded both of those points, thereby further indicating that there is no risk to EMD's trade secrets.

### 5. Jordan's Testimony

Jordan testified that WT did not try to steal business from EMD or engage in an unauthorized use of EMD's trade secrets. According to Jordan, WT merely offered a bid on the FRA contract as part of the public request for bids put out by the FRA after EMD decided to limit the scope of the tasks that EMD would perform for the ACT project. Jordan testified that WT was the successful bidder and entered into the ACT contract with the intention of using the FDK provided to SAIC to create the necessary messaging bridge. Jordan stated definitively that the individual Defendants have no intention of using information acquired while working for EMD

on the Fire system to write the messaging bridge. Jordan stated that if Defendants could not use the FDK, they would not create the messaging bridge. Jordan also stated that if Defendants were unable to use the FDK, they agreed with the FRA to a contingency plan under which SAIC would perform the necessary work on the ACT project. EMD provided no evidence that calls into doubt any of the assertions made by Jordan concerning Defendants' intention to use SAIC's FDK and the alternative plans of Defendants if they are not able to use the FDK. The Seventh Circuit has made it clear that a plaintiff is not entitled to a preliminary injunction merely based upon unfounded speculation regarding potential harm to the plaintiff. *See Goodman*, 430 F.3d at 437(stating that a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion"); *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001)(stating that "[a] preliminary injunction is an *extraordinary remedy* intended to preserve the status quo until the merits of a case may be resolved")(emphasis added). Therefore, based on all of the above, including the documentary evidence presented by EMD, we conclude that EMD has failed to present sufficient evidence to show that it has even a negligible likelihood of success on the merits in this case.

### B. No Adequate Remedy at Law and Irreparable Harm Factor

EMD argues that it has no adequate remedy at law for the potential harm that

may result from Defendants' use of the information concerning the Fire system and that EMD will suffer irreparable harm if the preliminary injunction is not issued. Generally, in regard to trademark infringement claims, there is a presumption that there is a threat of "irreparable injury for which there is no adequate remedy at law." *AM General Corp.*, 311 F.3d at 805. EMD, as the owner of the Fire trade secrets, has pointed to a risk of potentially irreparable harm to its trade secrets for which there is no adequate remedy at law. However, we note that, in this case, there is no evidence that shows that Defendants intend to take any actions that will cause harm to EMD. The evidence clearly shows that if Defendants cannot use SAIC's FDK to create the necessary messaging bridge, then Defendants do not intend to use their knowledge of the Fire system to write the messaging bridge. This means that either SAIC will use its FDK, or the ACT project will be defunct. The evidence also clearly shows that if Defendants' attempt to sublicense the FDK violates SAIC's licensing agreement or if EMD refuses to install the messaging bridge software, then Defendants will not be able to implement the messaging bridge and fulfill their obligations under the ACT contract. Thus, the evidence clearly shows that there is no immediate risk of harm to EMD's trade secrets.

### C. Balancing of the Harms Factor

EMD argues that if the court does not enter a preliminary injunction, there

will be harm to EMD because Defendants will unlawfully use EMD's trade secrets. However, as explained above, the evidence shows that EMD's fear is based upon nothing more than its own speculation. On the other hand, if the ACT contract was delayed due to an injunction in this action and the injunction stems from WT's involvement in the contract, WT's reputation and customer base could be significantly harmed. Therefore, we conclude that the balancing of the harms heavily favors a denial of the motion for a preliminary injunction.

D. Public Interest

The public interest, in general, is supported by protecting the rights of trade secret holders. However, the public interest is also served by ensuring that those who own proprietary interests in trade secrets do not exercise those interests in such a broad manner that they inhibit the general operation of commerce. The public interest is not served if the owner of a trade secret can shut down businesses in the market place for months or years while litigation is resolved every time that the owner speculates that there is potential risk to its trade secrets. In addition, the public will benefit from the timely completion of the proposed enhancements to the locomotives in the ACT project. For example, one of the enhancements will involve an upgrade of the security system on locomotives that would inhibit crimes, such as highjackings. The delay of the upgrade of the security system would thus create a

15

risk to the public. Therefore, we conclude that the public interest favors Defendants.

Based on all of the above, we conclude that a preliminary injunction is not warranted in this matter and we deny EMD's motion for a preliminary injunction. *See Goodman*, 430 F.3d at 437(stating that "[a] preliminary injunction is an *extraordinary and drastic remedy*")(quoting *Mazurek,* 520 U.S. at 972)(emphasis added).

II. Motion For Sanctions

Defendants move for sanctions pursuant to 28 U.S.C. § 1927 ("Section 1927"). Section 1927 permits a party to recover "excess costs, expenses, and attorneys' fees reasonably incurred" because an attorney for the opposing party "multiplies the proceedings . . . unreasonably and vexatiously . . . ." *Id*. Costs and fees may only be awarded under Section 1927 when the opposing party's attorney: 1) "has acted in an 'objectively unreasonable manner' by engaging in 'serious and studied disregard for the orderly process of justice,'" 2) "pursued a claim that is 'without a plausible legal or factual basis and lacking in justification,'" 3) "'pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound,'" or 4) declined to voluntarily dismiss a claim that is "no longer viable." *Jolly Group, Ltd. v. Medline Indus., Inc.* 435 F.3d 717, 720 (7th Cir. 2006)(quoting in part *Pacific Dunlop Holdings, Inc. v. Barosh,* 22 F.3d

113, 119 (7th Cir. 1994) and *Kapco Mfg. Co. v. C & O Enters., Inc.,* 886 F.2d 1485, 1491 (7th Cir. 1989)).

Defendants argue that EMD has unreasonably and vexatiously multiplied these proceedings by seeking a preliminary injunction in this action. Although EMD's arguments concerning its motion for a preliminary injunction clearly have no merit, there has not been a showing by Defendants that EMD pursued its motion for a preliminary injunction to prolong these proceedings or harass Defendants. EMD could reasonably have believed that it needed to attempt to protect any potential harm to its proprietary rights in its trade secrets and determined that the appropriate course of action was to pursue a preliminary injunction. Defendants have not shown that EMD's decision to pursue a motion for a preliminary injunction was anything other than part of the ordinary course of this litigation and Defendants are not entitled to attorneys' fees simply because EMD has not prevailed on the merits of its motion. Therefore, we deny Defendants' motion for sanctions.

## CONCLUSION

Based on the foregoing analysis, we deny EMD's motion for a preliminary injunction and deny Defendants' motion for sanctions.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated:   June 7, 2006